Filed 12/10/20  In re M.S. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.S. et al., Persons Coming Under the Juvenile Court Law. | B302333 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL S.,<br><br>Defendant and Appellant;<br><br>M.S., a Minor, etc., et al.,<br><br>Respondents. | Los Angeles County Super. Ct. Nos. 19CCJP06245A, 19CCJP06245B |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Reversed and remanded, with directions.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Respondents M.S., a Minor, etc., and A.S., a Minor, etc.

No appearance for Plaintiff and Respondent.

---

## INTRODUCTION

Father appeals from the juvenile court's dispositional order concerning visitation for father and his teenaged children, M.S. and A.S. (children).[1]  Father contends the juvenile court abused its discretion by failing to specify the frequency and duration of visits in its order and placing sole discretion as to whether any visits would occur in the hands of the children.  We agree. We thus reverse the visitation order and remand the matter with directions to the juvenile court to enter a revised order.

## BACKGROUND

The family was reported to the Los Angeles County Department of Children and Family Services (Department) in late August 2019 after father was arrested for domestic battery on the children's mother.  Mother reported that father kicked and struck her in the back while she was sleeping in A.S.'s room. Father said he nudged mother in the rear/lower back to get her to wake up.  A.S. was in the room at the time, but M.S. was not at home.  Shortly after the incident, father moved out of the family home to stay with paternal grandmother in San Diego.

A few days after the incident, Department social workers interviewed the children at their respective schools.  The children

---

[1]     M.S. was born in September 2002 and A.S. was born in November 2005.

2

again were interviewed in October 2019 at home.  M.S. described father as an "abusive alcoholic."  He said father had been drinking for about ten years.  Both children stated father drinks every night.

As for other incidents of domestic violence, M.S. told the social worker that around June 2018, mother came into M.S.'s room and told him that father had just hit her in the face.  He did not see father hit mother.  M.S. later added that father promised not to hit anyone after that incident.

M.S also recalled that when he was nine or 10 years old, father tried to hit mother but accidentally hit A.S.  A.S. described the incident as happening when she got in bed with parents after a nightmare.  Father accidentally hit her on the head when he got mad about something mother had said and tried to hit mother.

M.S. denied father being abusive of him or A.S., but remembered father pushed him onto the couch, causing him to bump his head, after M.S. called father "stupid" when father was drunk.  M.S. later described father as having tried to take a drunken swing at him when he was a sophomore in high school.

M.S. also described father as " 'verbally abusive' " to mother.  He has heard father call mother names.  M.S. said parents typically argued about financial issues.  Mother had quit her job when M.S. was born leaving father as the family's sole financial support.  M.S. described father as getting "upset with mother about not trying hard enough to find a job."  M.S. understood father's frustration, but did not think it excused his behavior.

A.S. described the August 2019 incident to the Department social worker.  A.S. was at a desk in her bedroom and mother was

lying on the bottom bunk bed. Father kicked mother on the small of her back, waking her up.[2] Mother said, " 'I can't believe you kicked me in front of our daughter.' " Father left the room and mother followed him. A.S. said that was the only time she witnessed physical violence between her parents. However, A.S. had "heard of father hitting mother." Father hit mother once when they were arguing, but A.S. did not see the altercation; M.S. had told her to stay in her room. A.S. told the social worker M.S. usually tried to stop the fight. A.S. also had heard father call mother names. She denied father ever having hit her or calling her names.

Neither child said they felt unsafe at home, but M.S. said he felt unsafe when father is abusive to mother. A.S. said she felt " 'wary' " when father is around. She said father would become more aggressive when he was drinking. A.S. felt there was "less stress" at home with father having moved out. She said that the issues at home " 'stress[ed her] out.' "

The social worker spoke to father by telephone. Father and mother have been married for 18 years, but he described their relationship as having deteriorated over the last few months. With respect to the incident leading to the Department's involvement, father said he was trying to help mother find work, but she had not sent her resume to a job prospect yet. He said he jostled mother awake with his foot and told her to send the resume. According to father, mother woke up and accused him of kicking her. He left the room and went to sleep in the living room. When he woke up, the police were there.

---

[2] During her October 2019 interview, A.S. said, " 'I guess he kicked her.' "

Father denied past domestic violence, but admitted he and mother call each other names during arguments. He denied the other instances of abuse described by the children. Father admitted law enforcement responded to an argument about eight years ago, but nothing happened.

Father admitted he had several beers in the evenings after work and said he drinks " 'pretty much' on a daily basis." He told the social worker he had not had any alcohol since the incident and is attending Alcoholics Anonymous (AA) meetings almost daily in San Diego. Father had sent the children an email and communicated with M.S. He did not have plans to see the children.

Mother did not make herself available to be interviewed.

On September 20, 2019, the juvenile court authorized the removal of the children from father. On September 25, 2019, the Department filed a juvenile dependency petition on behalf of the children under Welfare and Institutions Code[3] section 300, subdivisions (a) and (b), alleging the children were at substantial risk of harm as a result of father's violent conduct with mother, his alcohol abuse, and mother's failure to protect the children. The juvenile court held a detention hearing on September 26, 2019.

At the hearing, the court detained the children from father, and released them to mother's care. The court ordered father was to have monitored visitation and monitored telephonic contact with the children. The court also ordered father could have unmonitored text and email contact with the children, as

---

[3] Statutory references are to the Welfare and Institutions Code.

long as the messages were shown to a Department social worker. Finally, the court granted mother's request for a temporary restraining order against father precluding him from contacting mother or the children except for monitored visitation.

The Department filed its jurisdiction/disposition report on October 24, 2019. In addition to what already has been described, the Department reported mother's description of her marriage and the August 2019 incident. Mother said the August 2019 incident was the first time father had physically hit her. She described father as having " 'hostility and anger.' " She said he has had a drinking problem since before they were married. At one point he was in an AA program and did not drink for a year and a half. Mother did not intend to reunify with father and planned to file for divorce.

By this time, father was attending AA meetings three times a week in San Diego and reported he had not had any alcohol since August 26, 2019. Father had not had any visits with the children because they refused to see him. In October 2019, M.S. expressed his frustration and disappointment with father's drinking. He told the social worker he did not want "to physically see [father] until he has proven he is sober." A.S. said she wanted to have a relationship with father, but also did not want to see him " 'until he has stopped drinking.' " Both children were communicating with father via text.

The Department believed the family required its involvement "to ensure mother can demonstrate protective capacities and father maintains his sobriety."

The jurisdiction and disposition hearing was held on November 8, 2019. At the hearing, the court also considered

mother's request to extend the temporary restraining order for a permanent restraining order against father.

Father's counsel asked that the petition be dismissed for lack of a current risk of harm. Father filed a written statement with the court in support of his position. By this time, father and mother had separated and planned to divorce. Father stated he had voluntarily relocated to San Diego where he intended to live for the foreseeable future and had abstained from alcohol and all other substances since August 26, 2019, before the Department became involved. Father said he had been regularly attending and participating in AA meetings three times per week and offered the meeting sign-in sheets as evidence. Father also noted the criminal misdemeanor charge filed against him in August had been dismissed.

Father's counsel informed the court that father was communicating with the children through email and text, but they did not wish to visit with him at this time. Father's counsel represented that father had indicated "he will respect their wishes, and he has not sought visitation with the children." In his written statement, father acknowledged his "extreme regret for the actions and behaviors that have led me and my family to appear before this Court." He stated that his children "are intelligent, emotionally mature, well-rounded teenagers capable of expressing their desires concerning visitation or any potential custody issues: I will honor their wishes regarding issues of visitation whether it be to forgo visitation or have visits in the presence of a third person."

After hearing argument, the juvenile court sustained the petition as to father and declared the children dependents of

the juvenile court.[4]  The court removed the children from father and released them to mother.  The court ordered father was to have monitored visits, and the children's wishes were to be taken into account regarding the visits.

The court then engaged in a long discussion with counsel about the parameters and appropriateness of the restraining order, and how to account for father's visitation and communications with the children.  Counsel for the children— who were not present at the hearing—informed the court that the children were not ready to begin face-to-face visits with father, but had asked for electronic communication with him.

The court agreed to include the children in the restraining order, "with a carve out for monitored visitation with a neutral monitor when they are ready to visit and unmonitored text and emails."  The court ordered monitored visits to take place in Los Angeles County "when [the children] are ready to visit." Addressing father directly, the court said, "Now, Dad, you are going to have to be patient.  I'm not going to make the children visit until they are ready.  But . . . again, the carve out will be for allowing for unmonitored text and e-mails so long as they are appropriate."

As part of the court's order, the court "set up a mechanism" to enable father to come from San Diego to visit his children in Los Angeles County "and with the anticipation that [the visits] will be at a certain place at a certain time."  The court explained there would be "no visits with the children until they say they are ready.  But when they say they are ready and Dad comes up to

<hr>

[4]     At the hearing, the Department struck mother from the petition.

LA County, I expect mother to cooperate and make sure that he gets the visits that will be allowed under the order."

The court then stated the terms of the order on the record, including a three-year stay away order, no visits between father and the children until the children are ready, but father could contact the children through appropriate text and email. Visits must take place in Los Angeles County, and mother was required to take the children to the visits.

The November 8, 2019 minute order similarly reflected the terms of father's visitation. The court ordered monitored visits and gave the Department discretion to liberalize the visits. Additional terms are stated as: "Visits in a neutral setting[;] [¶] Father not to visit or reside in the home[;] [¶] Mother not to monitor his visits." The court's orders to the Department include that, "Minors' wishes to be taken into account re: visits," and that father was not to live or visit in the family home.

At the time of the November 8, 2019 jurisdiction and disposition hearing, M.S. was 17 years old, and A.S was 14 years old.

## DISCUSSION

Father's sole contention on appeal is that the juvenile court impermissibly delegated its authority over visitation by failing to specify the frequency and duration of visits and placing the sole discretion as to whether visits would take place with the children.

1.   ***Father did not forfeit his right to challenge the visitation order***

As an initial matter, the children's counsel argues father forfeited his right to challenge the terms of the visitation order because he failed to object to the trial court and "specifically

9

requested that no visits occur until the children were ready, which the court adopted."

Dependency matters are not exempt from the general rule that a "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Ibid*.) Father objected to the court's declaring the children dependents and asked the court to dismiss the matter "entirely." After the court sustained the petition, father's counsel did not specifically object to the visitation order, but she did note he had not had a visit. Father's counsel thus did not stand by " 'silently until the conclusion of the proceedings.' " (*In re C.M.* (2017) 15 Cal.App.5th 376, 385.)

Nevertheless, "application of the forfeiture rule is not automatic." (*In re S.B., supra*, 32 Cal.4th at p. 1293.) When the appeal involves an important legal issue, we may exercise our discretion to consider the forfeited claim. (*Id.* at pp. 1293-1294 [Court of Appeal did not abuse its discretion in considering challenge to visitation order, despite parent's failure to object, where trial court delegated authority to allow or prohibit visitation to legal guardians].) Even if father did not properly object to the juvenile court's order, his challenge implicates an important legal issue—whether the juvenile court impermissibly abdicated its discretion to decide whether visitation will occur at all. (*In re S.H.* (2003) 111 Cal.App.4th 310, 318-319 (*S.H.*) [allowing third party to determine whether "any visitation will occur" violates the separation of powers doctrine].)

10

We also disagree that father "requested that no visits occur until the children were ready." Rather, father acknowledged the children did not wish to see him and agreed to honor their wishes. That father did not want to force the children to visit him, however, was not an agreement to permit the juvenile court to give the children "de facto veto power" over all visitation. (*S.H., supra*, 111 Cal.App.4th at p. 319.)

**2.    *The visitation order must be revised***

We review the juvenile court's order setting visitation terms for abuse of discretion. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Visitation between a noncustodial parent and child is an important part of a reunification plan. (§ 362.1, subd. (a)(1)(A).) "It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances." ( *S.H., supra*, 111 Cal.App.4th at p. 317.)[5]

To maintain this flexibility, the juvenile court may "delegate discretion to determine the time, place and manner of the visits." (*In re Christopher H., supra*, 50 Cal.App.4th at p. 1009; *S.H., supra*, 111 Cal.App.4th at p. 317.) The "child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administrating visitation." (*S.H.*, at p. 317.) Nevertheless, the "sole power to determine whether visitation will occur" lies with the juvenile court. (*Christopher H.*, at pp. 1008-1009; *S.H.*, at

---

[5]    A court may deny visitation only if it would be harmful to the child. (§ 362.1, subd. (a)(1)(B); *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009.)

11

p. 317.) When the court orders visitation, however, "it must also ensure that at least some visitation, at a minimum level determined by the court itself, will in fact occur." (*S.H.*, at p. 313.) Thus, a juvenile court violates the separation of powers doctrine when it "abdicates its discretion" by "permit[ting] a third party, whether social worker, therapist or the child, to determine whether any visitation will occur." (*Id.,* at pp. 317-318 & fn. 10 [noting a therapist may be permitted to determine when visitation should begin].)

      *S.H.* is instructive. There, the juvenile court ordered monitored visitation for the mother, but because the children feared their mother and had refused visits during their initial detention, the visitation order specified, " 'if the children refuse a visit, then they shall not be forced to have a visit.' " (*S.H., supra*, 111 Cal.App.4th at pp. 313, 316.) Division Seven of this court reversed the order, finding it "impermissibly delegate[d] to [the] children the authority to determine whether any visits will occur." (*Id.* at p. 313.) The court acknowledged the order "affirmatively determine[d]" mother's right to visitation "rather than making [it] entirely contingent on the child's consent." (*Id.* at p. 318.) It also noted the juvenile court made additional orders designed to encourage visitation, including ordering counseling for the children and for their mother. (*Id.* at pp. 318-319.) Nevertheless, the court concluded that "by failing to mandate any minimum number of monitored visits per month or even to order that *some* visitation *must* occur each month, the [juvenile] court's abstract recognition of [the mother's] right to visitation [was] illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all." (*Id.* at p. 319.)

12

We conclude the visitation order here similarly placed the sole discretion as to whether any visitation would occur in the hands of the children. As in *S.H.*, the juvenile court here affirmatively acknowledged father's right to visitation. The court also entered orders to facilitate visitation by creating "a mechanism" for father to visit the children in Los Angeles County "with the anticipation that they will be at a certain place at a certain time." As children's counsel notes, the court ordered "specific parameters" for father's visitation. The court ordered visits to be monitored at a neutral setting with a neutral monitor; that, "[w]hen visits start," mother must confirm the scheduled visits 24 hours in advance with father; and that mother take the children to the visits.

Like the order in *S.H.*, however, the visitation order here did not require any minimum number of monitored visits per month or otherwise order some visitation to take place.[6] (*S.H., supra*, 111 Cal.App.4th at p. 319.) Rather, the court ordered, "no visits with the children until they say they are ready." Accordingly, the order essentially granted the children total discretion to determine when visits would begin and whether they would take place at all.

Although we agree the visitation order here was more specific than that in *S.H.* by articulating how visits would occur once they began, we disagree with the children's counsel that the order was sufficient "in the context of the family dynamics at play" and father's agreement "to forgo visitation" if that is

---

[6] The court permitted father to communicate with children through email or text, but, as father's counsel noted, the children could block father from their phone or delete his emails.

what the children wanted. Without providing guidance as to how frequently visitation should occur, the juvenile court effectively ceded its discretion to the children as to whether visits should occur at all. (See *In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1136 [reversing visitation order as improperly delegating authority to determine whether visitation would occur at all where order failed "to set a minimum number of visits or provide that appellant could visit the minor 'regularly' "]; *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757 ["court must define the rights of the parties to visitation," including, "the frequency and length of visitation"].)

We agree the children's wishes must be taken into account, particularly here where the children are teenagers who have expressed they do not wish to visit their father, and father has stated his desire to honor his children's wishes. Nevertheless, "while the juvenile court may allow the child to refuse to attend a particular visit, to prevent the child from exercising a de facto veto power, there must be some assurance that, should that occur, another visit will be scheduled and actually take place." (*S.H., supra*, 111 Cal.App.4th at p. 319.) As the court in *S.H.* so aptly stated, "In no event, however, may the child's wishes be the *sole* factor in determining whether any visitation takes place, either as a formal matter or, as occurred in the case now before us, by effectively giving the children the power to veto all visits." (*Ibid.*)

Here, the children's wishes were the *sole* factor in determining whether monitored visits with their father would occur, making father's right to visitation essentially illusory, as was the mother's in *S.H.* Even with the mechanism crafted by the court in place, neither the Department nor father had any

14

way of ensuring visits would take place, such as by rescheduling missed visits that the children decided not to attend.  We therefore conclude the juvenile court abused its discretion by ordering no visits were to take place until the children "are ready," without providing any guidance as to how frequently visitation should occur.

Our holding, however, does not preclude the juvenile court from ordering the children's wishes to be taken into account with respect to scheduling visits with father, nor should it be read to force children to visit with father.  We hold only, as courts have held before us, that the children's wishes not be the *sole* factor in determining whether any visitation takes place.  (E.g., *S.H., supra,* 111 Cal.App.4th at p. 319; *In re Julie M.* (1999) 69 Cal.App.4th 41, 50-51 [child's "aversion to visiting abusive parent may be a 'dominant' factor in administering visitation" but not "the *sole* factor"], citing *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237.)

## DISPOSITION

The portion of the November 8, 2019 order regarding father's monitored in-person visitation with the children is reversed. The matter is remanded to the juvenile court with directions to conduct further proceedings to revise the dispositional order to sufficiently define father's visitation rights by including the frequency and/or minimum amount of father's visits with the children.[7]

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.

---

[7] M.S. has now reached age 18. If the juvenile court has terminated its jurisdiction over M.S. due to his age, the visitation order should be revised as to A.S. only.